The Honorable Michelle L. Peterson

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| DAMAN LEE MICHAEL WANDKE, | Case No. 2:22-cv-00396-MLP |
| Plaintiff, | **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. #33)** |
| v. | |
| NATIONAL RAILROAD PASSENGER CORPORATION, | **NOTED ON MOTION CALENDAR: December 23, 2022** |
| Defendant. | |

**I.       INTRODUCTION**

Mr. Daman Wandke has already filed his Reply in Support of Plaintiff's Motion for Partial Summary Judgment (Dkt. #35).[1] In this Response to Defendant's Motion for Summary Judgment (Dkt. #33), Mr. Wandke will not rehearse all of the arguments and evidence set forth in his Reply. Instead, this Response will briefly review the undisputed evidence and respond to the affirmative arguments offered in Amtrak's Motion for Summary Judgment.

---

[1] In his Reply in Support of Plaintiff's Motion for Partial Summary Judgment, Mr. Wandke's counsel informed the Court that they had proposed to Amtrak's counsel that the parties agree that Mr. Wandke would file a combined reply in support of his motion for summary judgment and a response to Amtrak's motion for summary judgment. Amtrak's counsel rejected that proposal. Thus, Mr. Wandke is filing this Response to Amtrak's Motion for Summary Judgment (Dkt. #33).

WASHINGTON CIVIL & DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

1

2       As set out in Mr. Wandke's Motion for Partial Summary Judgment (Dkt. #27) and Reply

3   (Dkt. #35), the undisputed evidence demonstrates that the National Railroad Passenger

4   Corporation ("Amtrak") intentionally discriminated against Mr. Wandke on December 21,

5   2019, in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq.

6   ("ADA"), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Rehabilitation Act").

7   Further, the undisputed evidence demonstrates that Amtrak cannot sustain its burden of proof on

8   its affirmative defenses of laches and spoliation of evidence.

9       The Court should therefore deny Amtrak's Motion for Summary Judgment.

10  ## II.    THE UNDISPUTED EVIDENCE CONFIRMS THAT AMTRAK
           DISCRIMINATED AGAINST MR. WANDKE

11

12       On December 20, 2019, mudslides closed the Amtrak route from Seattle to Tacoma.

13  (*See* Dkt. #31-1 at 20:11–14.)[2] Amtrak has dealt before with service disruptions like the one

14  caused by the mudslides in December 2019. (*See* Dkt. # 33 at 10:17–19.) In such cases, Amtrak

15  arranges for buses to transport its passengers beyond the service disruption. (*Id.* at 11:4–5.) If

16  the train manifest indicates that a wheelchair-using passenger will need alternate transportation,

17  Amtrak will try to arrange in advance to provide for all passengers a wheelchair-accessible bus.

18  (*Id.* at 11:1–5.)

19       But if Amtrak's vendors cannot provide a wheelchair-accessible bus, Amtrak will wait

20  until the wheelchair-wheelchair-using passenger is at the station to call for some other form of

21  wheelchair-accessible transportation—in Seattle, at the time at issue, a wheelchair-accessible

22

23  ----
    [2] In its Motion for Summary Judgment, Amtrak suggests that the mudslides occurred on December 21,
24  2019. (*See* Dkt. #33 at 3:8–9, 10:19-21.) Amtrak may be attempting to suggest to the Court that Mr.
    Wandke was traveling on the same day that the mudslides occurred. But Amtrak admitted that the
25  mudslides occurred the day before, on December 20, 2019. (Dkt. #31-1 at 20:11–14.) Amtrak was not
    dealing with emergent circumstances, and it was not developing a plan on the fly. It was dealing with an
26  event for which it had a day's notice, using a policy that it had in place at the time. (Dkt. # 33 4:15–17.)

Plaintiff's Opposition to Defendant's Motion for
Summary Judgment (Dkt. #33) - 2
No. 2:22-cv-00396-MLP

WASHINGTON CIVIL & DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

taxi. (Dkt. #33 at 6:11–12.) Moreover, Amtrak follows this policy even though it knows that it can be hard to find a wheelchair -accessible taxi on the fly. (Dkt. #33 at 6:25–26.)

Amtrak's representative, Mr. Gregory Bannish, made it clear that Amtrak follows this upside-down arrangement of waiting until the wheelchair-using passenger is at the station before calling for an accessible taxi:

> [I]t's not something that we could order in advance, because we need to make sure that the passenger is here and at the station before we actually order that, and then we get in line and wait for them to get here.

(Dkt. #29-2 at 11–12 [Deposition of Gregory Bannish at 28:25–29:4].)

Thus, in these cases, Amtrak's policy calls for it to arrange in advance for a bus to be waiting at the King Street Station in Seattle to meet ambulatory passengers traveling on that train. (Dkt. #33 at 4:22–25.) But as a matter of policy, if it cannot obtain a wheelchair-accessible bus or minibus, it will try to arrange alternate transportation for its wheelchair-using passengers only after the passenger is actually waiting at the station. (Dkt. #33 at 6:11–12.) And Amtrak does so knowing that it can be hard to find wheelchair-accessible taxis. (Dkt. #33 at 6 n.6).

Thus, Amtrak's policy *deliberately discriminates* against wheelchair-using passengers by forcing them to wait for accessible service.

And that's exactly what happened in this case. In November 2019, Mr. Wandke purchased a ticket to travel on an Amtrak train from Bellingham, Washington, to Tacoma, Washington, so he could attend a holiday party near Gig Harbor. Mr. Wandke was going to travel on December 21, 2019. (Dkt. #28 at 2:1–7; *see also* Dkt. #33 at 3:5–6.)

When he booked his ticket, Mr. Wandke informed Amtrak that he would use a powered wheelchair. (Dkt. #28 at 2:8–9; Dkt. #33 at 3:6–7.) Thus, Amtrak knew in advance that Mr.

Wandke would need service which could accommodate a powered wheelchair from Bellingham to Tacoma. (*See* Dkt. #31-1 at 25:21–23; Dkt. #33 at 3:6–7.)

On December 20, Amtrak told Mr. Wandke about the service disruption caused by the mudslides in Tacoma. (Dkt. # 28:13–18.) And Amtrak told him that a wheelchair-accessible bus would be waiting for him at the King Street Station to take him from there to Tacoma. (Dkt. #28 at 2:10–3:5.) The next day, when Mr. Wandke went to the Bellingham train station, an Amtrak representative again told him that a wheelchair-accessible bus would be waiting for him in Seattle. (Dkt. #28 at 3:8–10.)

But Amtrak did not have a wheelchair-accessible vehicle of any sort waiting for Mr. Wandke at its Seattle station—even though it knew well before he arrived at the station that he was in fact on the train and traveling from Bellingham to Seattle, with plans to travel from there to Tacoma. (Dkt. #28 at 3:16–22.) Amtrak's failure to provide wheelchair accessible transportation to Mr. Wandke reflected Amtrak's deliberate choice—a choice made even though Amtrak knew that doing so would impose significant delays on its wheelchair using passengers. (Dkt. #33 at 6:11–12, 6:25–26.)

After Mr. Wandke arrived at the Seattle station, he learned that Amtrak was only then planning to call a wheelchair-accessible taxi to transport him to Tacoma. (Dkt. #28 at 3:11–22.) Mr. Wandke has testified that another wheelchair-using passenger was waiting at the Seattle station for accessible transportation. (Dkt. #28 at 3:18–19.) At the station, an Amtrak representative told Mr. Wandke that Amtrak had called for only one wheelchair-accessible taxi for the two wheelchair-using passengers. (Dkt. #28 at 3:20–22.)

A wheelchair-accessible taxi can safely carry only one passenger at a time. (Dkt. #28 at 4:3–15.) Mr. Wandke told an Amtrak representative about this problem, but the representative

WASHINGTON CIVIL & DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

ignored him. (Dkt. #28 at 4:16–18.) Mr. Wandke waited an additional twenty minutes for the single wheelchair-accessible taxi to arrive. (Dkt. #28 at 5:3–6.)  Finally, he gave up. (*Id.*) He abandoned his plan of attending the party at his aunt and uncle's house and chose instead to travel to Bainbridge Island, where his mother picked him up. (Dkt. #28 at 5:7–9.)

Mr. Wandke's experience on December 21, 2019, derived precisely from the discriminatory policy that Amtrak has adopted to respond to service disruptions—a policy that provides ambulatory passengers with alternative transportation waiting for them, but forces wheelchair-using passengers to wait indefinitely for accessible alternative transportation.

Amtrak has asserted to the Court that this is a reasonable approach. But its argument doesn't make sense. Amtrak has said that it won't call for wheelchair-accessible transportation until the wheelchair-using passenger is on the platform at the station. (Dkt. #33 at 6:11–12.) And it does so even though it knows that wheelchair-accessible taxis can be hard to find. (Dkt. #33 at 6:25–26.)

That explanation is entirely backward. Because Amtrak knows that it has a hard time sourcing wheelchair-accessible taxis, it should try to order those taxis in advance. Instead, it takes precisely the opposite approach—an approach virtually guaranteed to force its wheelchair-using passengers to wait for an indefinite time for accessible alternative transportation.

Amtrak has also argued that its policy constitutes a reasonable emergency plan. The Court has already recognized that Amtrak was not facing an emergency on December 21, 2019. (Dkt. #25 at 6:11–7:2.) After all, the mudslides occurred on December 20, 2019, a day before Mr. Wandke's trip. (Dkt. #31-1 at 20:11–14.) And Amtrak wasn't developing a plan on the fly but was instead implementing a policy that it had deliberately chosen and routinely applies. In

WASHINGTON CIVIL & DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

short, Amtrak deliberately chose in advance a plan that intentionally discriminates against wheelchair-using passengers.

Amtrak also appears to argue that it should be excused from complying with the Americans with Disabilities Act because it finds it challenging to do so. But that's not an excuse. Yes, it can be hard to comply with the ADA. That's why, left to their own devices, many businesses and government entities will choose not to offer comparable services to persons with disabilities. And that's why Congress enacted the ADA: to require businesses and government entities to provide comparable, nondiscriminatory services to persons with disabilities. *See* 42 U.S. Code § 12101 (findings and statement of purpose). The ADA does not provide an exemption for entities that simply find it inconvenient to comply with the Act. If it did, then any defendant could defeat an ADA complaint by saying, for example, "Your Honor, it just costs too much to install ramps and elevators, and it costs too much to make our doors and aisles wide enough for wheelchairs." Such an approach would gut the ADA.

Amtrak complains that it cannot order a Yellow Cab in advance. (Dkt. #33 at 6:9–10.) But the testimony that it cites doesn't support the assertion that it is impossible for Amtrak to order a wheelchair-accessible van in advance. Its sole employee witness, Mr. Bannish, did not testify to that effect. Mr. Wandke is familiar with ordering Yellow Cabs, and he confirms the unsurprising fact that, yes, it is indeed possible to order in advance a wheel-chair accessible van. (Declaration of Daman Wandke in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment ¶ 7.) But instead of doing the reasonable thing and ordering wheelchair-accessible vans in advance when it knows that they're needed, Amtrak chooses to wait until the passenger who needs such an accommodation is already on the platform. It doesn't treat its ambulatory passengers that way.

Plaintiff's Opposition to Defendant's Motion for
Summary Judgment (Dkt. #33) - 6
No. 2:22-cv-00396-MLP

WASHINGTON CIVIL & DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

In short, Amtrak itself has admitted that it discriminates against wheelchair-using passengers. The Court should therefore deny Amtrak's Motion for Summary Judgment.

Amtrak also asks the Court to grant its Motion for Summary Judgment on the grounds of laches and spoliation. As explained briefly in his Reply in Support of Plaintiff's Motion for Partial Summary Judgment (Dkt. #35), the Court should decline Amtrak's request on these grounds. The next two sections address at greater length Amtrak's arguments on those defenses.

## III.   AMTRAK FAILS TO MEET ITS BURDEN ON THE AFFIRMATIVE DEFENSE OF LACHES

The Court should deny Amtrak's request that it dismiss Mr. Wandke's claims on the basis of the affirmative defense of laches. (*See* Dkt. #33 at 15:18–17:19.) Amtrak's sparse argument on this defense fails to cite the leading Ninth Circuit cases and fails to cite any evidence supporting this defense, instead relying on unsupported assertions by its counsel. The defense should also not apply to Mr. Wandke's claims because Mr. Wandke seeks prospective injunctive relief and because of the public's interest in addressing Amtrak's discriminatory conduct.

### 1.   Amtrak Has Offered No Evidence That Mr. Wandke's Delay Caused It Any Prejudice

The defense of laches is an affirmative defense. Fed. R. Civ. P. 8(c)(1). Because laches is an affirmative defense, Amtrak bears the burden of establishing that it is entitled to judgment on that defense. *See id.*; *see also In re Smith,* No. 09-64178-tmr7, slip op. at 2 (Bankr. D. Or. Jul. 16, 2020) (noting that the defendant asserting the defense of laches "has the burden of proving its affirmative defense"). Amtrak has failed to sustain its burden.

As noted in Mr. Wandke's Reply, Amtrak failed to inform the Court that the defense of laches will typically not apply if suit is filed within the related statute of limitations: "If the

WASHINGTON CIVIL & DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

plaintiff filed suit within the analogous limitations period, **the strong presumption is that laches is inapplicable.**" *Jarrow Formulas, Inc. v. Nutrition Now, Inc.,* 304 F.3d 829, 835 (9th Cir. 2002) (citation omitted; emphasis added). Amtrak admits that Mr. Wandke filed within the applicable statute of limitations. (Dkt. #33 at 15:19–21.) The Court should therefore presume that the defense of laches does not apply. *See Jarrow Formulas,* 304 F.3d at 835.

Further, Amtrak fails to cite any evidence supporting this defense. "A party asserting laches must show that it suffered prejudice as a result of the plaintiff's unreasonable delay in filing suit." *Id.* at 840. Prejudice is "the essential element of laches." *Sandvik v. Alaska Packers Ass'n,* 609 F.2d 969, 972 (9th Cir. 1979). "A lengthy delay, even if unexcused, that does not result in prejudice does not support a laches defense." *Grand Canyon Tr. v. Tucson Elec. Power Co.,* 391 F.3d 979, 988 (9th Cir. 2004).

Assertions of prejudice cannot be "conclusory" but must instead be supported by evidence establishing specific prejudice caused by the delay. *Sandvik,* 609 F.2d at 972–73. In *Sandvik,* the Ninth Circuit reversed judgment in favor of the defendant because the record lacked any affirmative evidence showing that the defendant had suffered any prejudice because of the delay. *See id.*

Amtrak has not offered affirmative evidence of prejudice, but instead offers only conclusory assertions supporting the defense:

> Wandke's claims have placed Amtrak in the untenable position of being unable to refute his allegations. The Amtrak employees involved, including the individual who spoke with Wandke after he called Amtrak on December 20, 2019, the person who Wandke allegedly spoke to about how many Yellow Cab vans had been requested, and the employee who assisted Wandke with his luggage, are either unidentifiable, have left Amtrak's employment, or have no memory of the events. (See Deeg Decl., ¶ 3.) In particular, the Amtrak employee in charge of such accommodations at that location on that date, Mr. Bannish, has no

recollection of Wandke's specific situation. Bannish Dep. 33:19–25, 34:6–8, 50:13–17, 51:5–6. Amtrak has no way to verify what Wandke claims he was told about how he would be accommodated, when the Yellow Cab van was to arrive, or how long he waited for it before leaving the station. Had Wandke filed his Complaint closer to the time he decided to pursue filing suit, that is, in January of 2020, this prejudice to Amtrak could have been avoided. Wandke Dep. 21:22–22:8. Instead, Wandke waited 25 months to file suit. Had Wandke filed his Complaint closer to the time he decided to pursue filing suit, that is, in January of 2020, this prejudice to Amtrak could have been avoided.

(Dkt. #33 at 17:6–17.)

In considering this argument, the Court should note that Amtrak's argument rests solely on its claim that it is prejudiced by witnesses' fading memories. It has not provided any evidence that it destroyed any documents because of Mr. Wandke's delay. Indeed, its principal witness, Mr. Gregory Bannish, expressly testified that he does not keep records of phone calls made to providers of alternate transportation:

> Q.      . . . [W]hen when you go down your list of alternative transportation providers in the event of a service disruption, do you keep records of the calls that you make to these companies?
>
> A. I—I do—**I do not.**

(Declaration of Conrad Reynoldson in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment ["2d Reynoldson Decl."], Ex. 1 [Deposition of Gregory Bannish] at 45:4–8.)

Mr. Bannish also testified that he makes a spreadsheet as he tries to source alternative transportation. (*Id.* [Bannish Dep. at 45:11–19].) But Mr. Bannish doesn't save those spreadsheets, either. (*Id.* [Bannish Dep. at 45:23–46:6].)

In short, Amtrak has not shown that it destroyed any documents because of Mr. Wandke's delay. Further, it has not put into evidence its document retention policy, if any.

Plaintiff's Opposition to Defendant's Motion for
Summary Judgment (Dkt. #33) - 9
No. 2:22-cv-00396-MLP

WASHINGTON CIVIL & DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

1
2
Thus, it has offered no evidence that Mr. Wandke's delay caused the destruction of its

documents.
3
4
Amtrak also hasn't offered any evidence that the delay caused its employees to be

unable to remember the events of December 21, 2019. Instead, Amtrak relies principally on a
5
6
self-serving claim by one of its attorneys (Mr. Mathias Deeg) that some nameless Amtrak

employees cannot remember the events at issue:
7
8
> In the course of its fact-finding inquiries early in litigation, counsel
> for Amtrak questioned employees known to have worked at the
> Bellingham and Seattle Amtrak stations on December 21, 2019. No
> employee questioned had any memory of the events of that day or Mr.
> Wandke's presence, actions, or requests.
9
10
11
(Dkt. #34 at 2 ¶ 3.)[3]
12
Mr. Deeg does not testify that he was the attorney who contacted any of these
13
employees. (*See id.*) Nothing shows that he himself is competent to identify which Amtrak
14
15
employees worked in the relevant positions. (*See id.*) He claims that these nameless employees

don't have any memory of the day or of Mr. Wandke. But Mr. Deeg's assertion about the
16
17
memories of these nameless employees is hearsay, as he is offering his own (or perhaps some

other attorney's) statement of what those persons allegedly said, and he is offering that
18
19
testimony for the truth of the matter asserted—that is, that they cannot remember December 21,

2019, or Mr. Wandke. *See* Fed. R. Evid. 801(c), 802.
20
21
22
23
---
[3] The Court should note that Amtrak's lawyers apparently contacted potential witnesses "early in
litigation." (Dkt. #34 at 2 ¶ 3.) But Amtrak waited until a mere 12 days before the close of discovery to
identify most of those persons to Mr. Wandke's lawyers, even though Mr. Wandke's discovery requests
had called for their identities. (Dkt. #29-10, esp. at 26:10–27:17.) Mr. Deeg's Declaration testimony
suggests that Amtrak intentionally chose not to identify potential witnesses to Mr. Wandke's lawyers as a
tactical matter.
24
25
26

Plaintiff's Opposition to Defendant's Motion for
Summary Judgment (Dkt. #33) - 10
No. 2:22-cv-00396-MLP

WASHINGTON CIVIL & DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

1

2          Moreover, Amtrak doesn't offer any testimony from any of these nameless persons

3   about their knowledge (or lack of knowledge) of the day in question. Nor does it offer any

4   testimony that, had they been contacted earlier, they could have remembered Mr. Wandke or the

5   events of that day. Amtrak's assertions about its employees' memories are simply unverifiable

6   assertions by its lawyers.

7          Amtrak also asserts that Mr. Gregory Bannish cannot remember the details of Mr.

8   Wandke's alleged delay. (Dkt. #33 at 17:11–13.) Mr. Bannish did testify that he does not

9   remember what happened. But he did *not* testify that he could have remembered the events of

10  December 21, 2019, had Mr. Wandke brought suit sooner. That assertion appears nowhere in

11  Mr. Bannish's testimony as provided by Amtrak.

12         Even if Mr. Bannish had offered testimony to that effect, the Court should refuse to

13  conclude that such an assertion, by itself, establishes a defense of laches. Amtrak has not cited

14  any case that supports such a rule. It cites two cases in support of the defense: *In re Dalziell,*

15  608 B.R. 245 (Bankr. E.D. Wash. 2019), and *Romans v. Incline Village General Improvement*

16  *District,* No. 14-16590, 658 F. App'x 304 (9th Cir. July 26, 2016). But neither of those cases

17  concerned a defense of laches based on fading memories. *In re Dalziell* concerned actions taken

18  by the debtors that they might not have taken in the absence of the creditor's delay. *See In re*

19  *Dalziell,* 608 B.R. at 252. And *Romans v. Incline Village* concerned the loss of documents by a

20  third party, which loss could have been avoided had the plaintiff filed suit earlier. *Romans,* No.

21  14-16590, slip op. at 5.

22         The Court should decline to extend the doctrine of laches to cases brought within the

23  relevant statute of limitations if the defense rests simply on the defendants' claim that witnesses

24  merely cannot remember an event. Such a rule would mean that a defendant could almost

25

26

always, through its own self-serving testimony, sustain a defense of laches simply by asserting that some critical witness or witnesses cannot remember an event. Such a claim could be made at any time. After all, people may forget events that occurred even a few weeks or even days before they are asked to recall them.

Moreover, it would be impossible for a plaintiff to rebut such a claim made by a defendant. Amtrak's rule would thus create an incentive for defendants always to assert that *any* passage of time—even a few days—had prejudiced their ability to defend a suit. The Court should decline to adopt such a perverse rule.

The Court already has a good rule to follow here—that is, the "strong presumption" that the defense of laches does not apply to a case brought within the applicable statute of limitations. *See Jarrow Formulas,* 304 F.3d at 840. Statutes of limitations are designed to address the problem of fading memories. The Court should not adopt Amtrak's rule, which would permit a cynical defendant to raise the defense of laches in any case involving equitable relief based solely on the defendant's self-serving claims about lost memories. The Court should instead apply the "strong presumption" against laches required by *Jarrow Formulas* and reject Amtrak's laches defense.

### 2. The Defense of Laches Does Not Apply to Mr. Wandke's Claims for Prospective Injunctive Relief

The Court should also reject Amtrak's laches defense to the extent that Amtrak seeks dismissal of Mr. Wandke's claims for prospective injunctive relief.

In the Ninth Circuit, laches does not usually bar prospective injunctive relief: "Laches stems from prejudice to the defendant occasioned by the plaintiff's past delay, but almost by definition, the plaintiff's past dilatoriness is unrelated to a defendant's ongoing behavior that threatens future harm." *Danjaq LLC v. Sony Corp.,* 263 F.3d 942, 959-60 (9th Cir. 2001)

Plaintiff's Opposition to Defendant's Motion for
Summary Judgment (Dkt. #33) - 12
No. 2:22-cv-00396-MLP

WASHINGTON CIVIL & DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

1
2
3
4
5
6
7

(citation omitted). The *Danjaq LLC* court quoted with approval a Fourth Circuit opinion that explains why laches does not usually apply to prospective injunctive relief: "A prospective injunction is entered only on the basis of current, ongoing conduct that threatens future harm. Inherently, such conduct cannot be so remote in time as to justify the application of the doctrine of laches." *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 799 (4th Cir. 2001) (quoted with approval in *Danjaq LLC,* 263 F.3d at 959–60).

8
9
10
11
12

In this case, Mr. Wandke is seeking prospective injunctive relief. He is asking the Court to order Amtrak to provide safe, timely transportation to its wheelchair-using customers, just as it does to its ambulatory customers. Amtrak has admitted that it still adheres to its discriminatory policy, which forces wheelchair-using passengers to wait indefinite periods in the hope that, eventually, a wheelchair-accessible vehicle will arrive at their station.

13
14
15

Because Amtrak is still engaging in this discriminatory conduct, Mr. Wandke's delay in bringing this lawsuit cannot have prejudiced Amtrak to the extent that the defense of laches should apply.

16
17

### 3. The Defense of Laches Should Not Apply Because the Public Has a Strong Interest in Ensuring That Amtrak Correct Its Discriminatory Policy

18
19

The Court should also reject the defense of laches because the public has a strong interest in having this action proceed to ensure that Amtrak corrects its discriminatory policy.

20
21
22
23
24
25

"Because laches is an equitable remedy, laches will not apply if the public has a strong interest in having the suit proceed." *Jarrow Formulas,* 304 F.3d at 840. In this case, Mr. Wandke is challenging Amtrak's policy of discriminating against persons with disabilities when providing alternate transportation. Because that policy affects not just Mr. Wandke but also other wheelchair-using passengers, "the public has a strong interest in having the suit proceed." *See id.*

26

Plaintiff's Opposition to Defendant's Motion for
Summary Judgment (Dkt. #33) - 13
No. 2:22-cv-00396-MLP

WASHINGTON CIVIL & DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

This case resembles other public interest lawsuits, as the public has a significant interest in ensuring that entities such as Amtrak adhere to laws intended to redress society-wide ills. In public interest lawsuits, the Ninth Circuit has warned that the defense of laches should not apply: "We have repeatedly cautioned against application of the equitable doctrine of laches to public interest environmental litigation." *Portland Audubon Soc. v. Lujan,* 884 F.2d 1233, 1241 (9th Cir. 1989). As the Ninth Circuit has explained:

> Laches must be invoked sparingly in environmental cases because ordinarily the plaintiff will not be the only victim of alleged environmental damage. A less grudging application of the doctrine might defeat Congress' environmental policy.

*Preservation Coalition, Inc. v. Pierce,* 667 F.2d 851, 854 (9th Cir. 1982) (citations omitted; quoted with approval in *Portland Audubon Soc.,* 884 F.2d at 1241).

In this case as in public interest environmental cases, "the plaintiff will not be the only victim of alleged [discriminatory practices]." *See id.* Application of the doctrine of laches would defeat Congress's policy, expressed in the ADA and the Rehabilitation Act, of ensuring that persons with disabilities have equal access to the services provided by Amtrak.

The Court should therefore decline to apply the doctrine of laches.

## IV.    THE COURT SHOULD REJECT AMTRAK'S REQUEST THAT IT DISMISS MR. WANDKE'S CLAIMS BASED ON THE DOCTRINE OF SPOLIATION

The Court should also deny Amtrak's request that it dismiss Mr. Wandke's claims on the basis of claimed spoliation of evidence.

In his Reply brief, Mr. Wandke explained that Amtrak's own admissions and even assertions establish that the doctrine of spoliation should not apply. (Dkt. #35 at 10:21–12:11.) Amtrak itself has admitted that it adopted and continues to adhere to a policy that deliberately discriminates against wheelchair-using passengers. The fact that Mr. Wandke unintentionally

Plaintiff's Opposition to Defendant's Motion for
Summary Judgment (Dkt. #33) - 14
No. 2:22-cv-00396-MLP

WASHINGTON CIVIL & DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

failed to retain some information from his telephone cannot change Amtrak's own admissions
and assertions.

Further, Amtrak has not met its burden of showing that the doctrine of spoliation should
apply:

> A party seeking sanctions for spoliation of evidence must prove the
> following elements: (1) the party having control over the evidence had an
> obligation to preserve it when it was destroyed or altered; (2) the
> destruction or loss was accompanied by a "culpable state of mind;" and (3)
> the evidence that was destroyed or altered was "relevant" to the claims or
> defenses of the party that sought the discovery of the spoliated evidence[.]

*Surowiec v. Capital Title Agency Inc.,* 790 F. Supp. 2d 997, 1005 (D. Ariz. 2011) (quoting
*Goodman v. Praxair Servs., Inc.,* 632 F. Supp. 2d 494, 509 (D.Md. 2009)).

Even if Mr. Wandke had a duty to preserve the telephone records at issue, Amtrak has
not shown that he had a "culpable state of mind." *See id.* Mr. Wandke had no intention of losing
his telephone records. (Declaration of Daman Wandke in Support of Plaintiff's Opposition to
Defendant's Motion for Summary Judgment ¶ 13.) Shortly after the incidents of December 21,
2019, Mr. Wandke was offered the opportunity to use a new cell phone that is more accessible
for persons with disabilities. (*Id.* ¶ 14.) After receiving that phone, he returned his other phone
to a Verizon store. (*Id.* ¶15.) When he returned the phone, he believed that his phone records
would remain available and, in particular, he believed that the text messages that he had sent
and received on his old phone would be available on his new phone. (*Id.* ¶16.) He did not know
that, in switching to the new phone, he would lose access to those records. (*Id.* ¶17.) When he
realized that he could no longer access his old text messages on his new phone, he both called
Verizon and went to a Verizon store and sought help from customer service representatives
there. (*Id.* ¶17.) But he was not successful in obtaining the records. (*Id.*)

WASHINGTON CIVIL & DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

1

2

In short, Mr. Wandke did not have a "culpable state of mind." *See Surowiec,* 790 F.

3

Supp. 2d at 1005.

4

Further, Amtrak has apparently made no effort to determine whether Mr. Wandke's

5

statements are false. Mr. Wandke disclosed as potential witnesses his mother, Ms. Michelle

6

Gonzalez, and his sister, Ms. Kassidy Oloff. Had Amtrak done so, it could have asked Ms.

7

Gonzalez and Ms. Oloff whether Mr. Wandke had told them something different from what he

8

is now testifying. Had Amtrak done so, it would have learned that Mr. Wandke told Ms.

9

Gonzalez and Ms. Oloff the same thing that he has told Amtrak and told the Court. (*See*

10

Declaration of Michelle Gonzalez; Declaration of Kassidy Oloff.)

11

Amtrak may object that Ms. Gonzalez's and Ms. Oloff's declarations regarding Mr.

12

Wandke's statements constitute inadmissible hearsay. But Mr. Wandke is not offering their

13

testimony for the truth of the matter asserted in his communications identified in those

14

declarations. He is offering their declarations only to rebut Amtrak's implicit claim that he told

15

his mother and sister something different from what he has told the Court.

16

Of course, if Amtrak wanted to submit testimony from Ms. Gonzalez and Ms. Oloff

17

regarding Mr. Wandke's statements to them, then their testimony would be admissible as an

18

admission of a party opponent. *See* Fed. R. Evid. 801(d)(2). But Amtrak apparently made a

19

tactical decision not to contact those witnesses to ask them whether Mr. Wandke later made up a

20

story about what happened at the King Street Station on December 21, 2019. Instead, it is

21

asking the Court to presume that Mr. Wandke's testimony was false.

22

Amtrak apparently developed other evidence showing that Mr. Wandke is telling the

23

truth. The day before the close of discovery, Amtrak produced an email exchange between Mr.

24

Jared Garth, one of its in-house attorneys, and Ms. Kelly Newbrook, who rode the same train

25

26

Plaintiff's Opposition to Defendant's Motion for
Summary Judgment (Dkt. #33) - 16
No. 2:22-cv-00396-MLP

WASHINGTON CIVIL & DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

1
2
3
4

that Mr. Wandke took on December 21, 2019. In response to Mr. Garth's email asking for information, Ms. Newbrook wrote that, yes, Amtrak delayed assisting a wheelchair-using passenger that day:

5
6
7
8
9

> To answer your questions about traveling with Amtrak on Dec 21, 2019. I am not sure if i remember correctly but, do remember being transferred to a bus, maybe a Grey Hound? They took me to Vancouver Amtrak Station which was where I was headed. It did take quite a while for an assistant to come get me because am Deaf and Legally Blind. **I do remember someone in a wheelchair still on board when I got off trying to get attention not to be abandoned** and a woman came up driving a cart to get me to take me to the Bus and I did mention to her about the man in a wheelchair and she said someone else will get him.

10

(Dkt. #29-1 at 3–4 [emphasis added].)

11
12
13
14
15

In short, the undisputed evidence establishes that Mr. Wandke is indeed telling the truth about what happened on December 21, 2019. Amtrak's own evidence confirms virtually all of Mr. Wandke's testimony. Amtrak has affirmatively told the Court that it had and continues to maintain a policy that deliberately discriminates against persons with disabilities.

16
17

In light of Amtrak's own admissions, the Court need not indulge Amtrak's spoliation argument.

18

**V.      CONCLUSION**

19
20
21
22
23
24

Amtrak has told the Court that it discriminated against Mr. Wandke because of his disability. On the evening of December 21, 2019, Amtrak provided its ambulatory passengers with safe, timely transportation from Seattle to Tacoma. It did not provide Mr. Wandke with safe, timely accessible transportation. It failed to do so because of its deliberately chosen policy, a policy that calls for it to wait to provide such transportation to wheelchair-using passengers until they are on the platform at the station. And Amtrak adopted, follows, and continues to

25
26

Plaintiff's Opposition to Defendant's Motion for
Summary Judgment (Dkt. #33) - 17
No. 2:22-cv-00396-MLP

WASHINGTON CIVIL & DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

defend that policy despite knowing, both in December 2019 and December 2022, that it is difficult to provide its wheelchair-using passengers with appropriate alternative transportation.

Mr. Wandke believes that Amtrak can and should do better. Amtrak should be able to develop a plan that calls for it—when it knows that a wheelchair-using passenger will need wheelchair-accessible alternative transportation—to begin working in advance to provide that transportation and not wait until the passenger has already arrived at the platform or require that passenger to submit to unsafe transportation.

In light of the undisputed evidence, Plaintiff respectfully requests that the Court deny Amtrak's Motion for Summary Judgment.

Dated this 19th day of December 2022

By:

WASHINGTON CIVIL & DISABILITY ADVOCATE

/s/ Conrad Reynoldson
Conrad Reynoldson, WSBA #48187
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 876-8515
conrad@wacda.com

/s/ Marielle Maxwell
Marielle Maxwell, WSBA #54957
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 455-6430
marielle@wacda.com

Attorneys for Plaintiff

Plaintiff's Opposition to Defendant's Motion for
Summary Judgment (Dkt. #33) - 18
No. 2:22-cv-00396-MLP

WASHINGTON CIVIL & DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

1

PRUETT WALTERS LARSEN PLLC

2

/s/ *Daniel J. Gunter*

3

———————————————————————

4

Mark D. Walters, WSBA No. 25537
Daniel J. Gunter, WSBA No. 27491

5

11120 NE 2d Street, Suite 100
Bellevue, WA 98004

6

Mark D. Walters: (206) 669-6986
mwalters@rpwlawfirm.com

7

Daniel J. Gunter: (651) 529-0163
dgunter@rpwlawfirm.com

8

9

Attorneys for Plaintiff

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

WASHINGTON CIVIL & DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury under the laws of the State of Washington that on the date below, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, who will send notification of such filing to all following attorneys of record in this proceeding:

**Mathias Deeg**, WSBA No. 52864
LITTLER MENDELSON, P.C.
One Union Square
600 University Street Suite 3200
Seattle, WA 98101
Telephone:   206-623-3300
Facsimile: 206-447-6965
Email: mdeeg@littler.com

**Daniel Thieme**, WSBA No. 12855
LITTLER MENDELSON, P.C.
One Union Square
600 University Street Suite 3200
Seattle, WA 98101
Telephone:   206-623-3300
Facsimile: 206-447-6965
Email: dthieme@littler.com

*Attorneys for Defendant*

DATED this 19th day of December 2022

*/s/Marielle Maxwell*
Marielle Maxwell
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
206-428-3172

Plaintiff's Opposition to Defendant's Motion for
Summary Judgment (Dkt. #33) - 20
No. 2:22-cv-00396-MLP

WASHINGTON CIVIL & DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558