UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DAMAN LEE MICHAEL WANDKE,

              Plaintiff,

    v.

NATIONAL RAILROAD PASSENGER
CORPORATION,

              Defendant.

Case No. C22-396-MLP

ORDER

This matter is before the Court on three motions: (1) Defendant National Railroad
Passenger Corporation's ("Amtrak") Motion to Withdraw and Amend Deemed Admissions
("Def.'s Mot. to Amend" (dkt. # 30)); (2) Plaintiff Daman Lee Michael Wandke's Motion for
Partial Summary Judgment ("Pl.'s Mot." (dkt. # 27)); and (3) Amtrak's Motion for Summary
Judgment ("Def.'s Mot." (dkt. # 33)). Mr. Wandke filed an opposition to Amtrak's Motion to
Amend ("Pl.'s Opp. to Amend." (dkt. # 32)), and Amtrak filed a reply ("Def.'s Reply on
Amend." (dkt. # 36)).

Amtrak's Summary Judgment Motion included its opposition to Mr. Wandke's Partial
Summary Judgment Motion. (Def.'s Mot.) Mr. Wandke filed a reply in support of his Partial
Summary Judgment Motion ("Pl.'s Reply" (dkt. #35)), and an opposition to Amtrak's Summary

Judgment Motion ("Pl.'s Resp." (dkt. # 37)). Amtrak filed a reply in support of its Summary

Judgment Motion ("Def.'s Reply" (dkt. # 42)).

No party requested oral argument. Having considered the parties' submissions, the

governing law, and the balance of the record, the Court: (1) GRANTS in part and DENIES in

part Amtrak's Motion to Amend (dkt. # 30); (2) DENIES Mr. Wandke's Partial Summary

Judgment Motion (dkt. # 27); and (3) DENIES Amtrak's Summary Judgment Motion (dkt. # 33).

## I.      BACKGROUND

### A.      Factual Background

Mr. Wandke purchased a ticket to take an Amtrak train from Bellingham, Washington, to

Tacoma, Washington, on December 21, 2019. (First Wandke Decl., Ex. A (dkt. # 28-1) at 4.)

The ticket was for a "Wheelchair Space" for an adult with "Reduced Mobility." (*Id.*)

On December 20, 2019, Amtrak emailed Mr. Wandke that his trip would be "affected due

to mud slides" and stating, "we've already set up alternate transportation for some or all of your

route, and there's nothing you need to do." (First Wandke Decl., Ex. B (dkt. # 28-2).) Mr.

Wandke stated in a declaration that he called Amtrak for clarification. (First Wandke Decl. at

¶ 12.) Mr. Wandke testified that an Amtrak agent informed him the train would take him from

Bellingham to Seattle and a bus would take him from Seattle to Tacoma. (*Id.*) Mr. Wandke

further testified that the Amtrak agent informed him that Amtrak was aware he would be using a

power chair and that "Amtrak had already arranged to provide [him] with accessible bus

transportation from Seattle to Tacoma." (*Id.* at ¶ 14.)

Mr. Wandke testified that, on the day of his trip, an Amtrak representative at the

Bellingham station "assured [him] that an accessible bus would be waiting for [him] in Seattle to

transport [him] to Tacoma when [he] arrived." (First Wandke Decl. at ¶ 16.) While on the train,

1    "another Amtrak representative told [Mr. Wandke] that there was no accessible bus, but that

2    Amtrak had arranged an accessible taxi cab for [him]." (*Id.* at ¶ 17.)

3        After Mr. Wandke had arrived in Seattle and waited approximately twenty minutes for

4    his luggage, "an Amtrak representative told [him] that an accessible cab had just been ordered

5    and it would be at least [forty] more minutes before it arrived." (First Wandke Decl. at ¶¶ 19, 22;

6    *see also* First Reynoldson Decl., Ex. J (dkt. # 29-7) (Wandke Dep. at 22:16-24:7).) Mr. Wandke

7    "learned that another passenger using a power wheelchair was also waiting for accessible

8    transportation from the Seattle Amtrak Station[.]" (First Wandke Decl. at ¶ 21.) The Amtrak

9    representative told Mr. Wandke that "Amtrak had ordered only one accessible cab" for both of

10    them. (*Id.* at ¶ 23; First Reynoldson Decl., Ex. J (Wandke Dep. at 24:1-16).) Based on Mr.

11    Wandke's experience, "an accessible cab can only fit one power chair safely[.]" (First Wandke

12    Decl. at ¶¶ 24-28.) Mr. Wandke stated he "relayed [his] concerns regarding safety to an Amtrak

13    representative" who told him Amtrak was nevertheless planning to transport both wheelchair

14    users in one accessible taxi. (*Id.* at ¶ 29.)

15        Forty minutes after arriving in Seattle, all ambulatory passengers on the train had already

16    left on an Amtrak-provided bus. (First Wandke Decl. at ¶ 31.) At that point, Mr. Wandke and the

17    other wheelchair user "were again told that it would be at least another [forty] minutes before the

18    accessible taxi arrived." (*Id.* at ¶ 32.) Because the other wheelchair user told him "that she had no

19    other option but to wait" for Amtrak-provided transportation, Mr. Wandke decided to make other

20    arrangements and left the station. (*Id.* at ¶¶ 30, 33.) Mr. Wandke was unable to attend the family

21    gathering for which he had purchased the train ticket because Amtrak failed to safely and timely

22    transport him to Tacoma. (*Id.* at ¶¶ 36, 41.)

23

Amtrak District Station Manager Gregory J. Bannish testified that on December 21, 2019, he was the employee in charge of finding alternate transportation in the event of service disruptions at the Seattle station. (Second Deeg Decl., Ex. C (dkt. # 34-1) (Bannish Dep. at 12:25, 26:3-8).) Mr. Bannish did not recall the service disruption of December 21, 2019, specifically, but described his policies and procedures for such an event. (*Id.* at 34:7-8.)

Mr. Bannish testified that he would review the passenger manifest to determine how many 50-passenger buses were needed and what special service needs passengers had. (Second Deeg Decl., Ex. C (Bannish Dep. at 26:16-27:10).) He would then contact bus companies to see "if they've got [buses with] wheelchair lifts available" and would "try to request one at all times." (*Id.* at 27:11-13.) If unavailable, he would "try to get a minibus, which is a 23-passenger bus," that could accommodate wheelchair-using passengers. (*Id.* at 27:21-25.) Failing that, "the other option . . . is Yellow Cab here in Seattle," which has "a couple of ADA accessible vans[.]" (*Id.* at 28:1-4.)

In a submitted declaration, Mr. Bannish explained that, unlike buses, "[t]axis and vans . . . will not wait for passengers who are not present." (Bannish Decl. (dkt. # 43) at ¶ 5.) Mr. Bannish described companies that have stopped working with Amtrak "because too often passengers were not present when transportation arrived at the station." (*Id.*) Therefore, Mr. Bannish's practice is to "wait for confirmation that passengers are at the station in question before requesting taxi service[.]" (*Id.* at ¶ 6.)

Mr. Bannish testified that, to his knowledge, "only one [wheelchair user] can go in each of the vans." (Second Deeg Decl., Ex. C (Bannish Dep. at 30:25-31:3).) While he was "not 100 percent sure of that[,]" he stated he has "never put more than one in a vehicle before." (*Id.* at 31:3-5.)

### B.      Procedural History

On March 30, 2022, Mr. Wandke filed the instant action alleging Amtrak violated: (1) Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*; and (2) Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. (Compl. (dkt. # 1).)

On September 26, 2022, Amtrak received Mr. Wandke's First Requests for Admission ("RFA"). (First Reynoldson Decl. at ¶ 8; First Deeg Decl. (dkt. # 31) at ¶ 2.) According to Amtrak's counsel, Amtrak completed its objections and answers on October 14, 2022, and "scheduled production" of them for the deadline of October 26, 2022. (First Deeg Decl. at ¶ 3.) Discovery closed on October 26, 2022. (Dkt. # 14.)

On November 10, 2022, with the filing of Mr. Wandke's Partial Summary Judgment Motion, Amtrak realized it had failed to serve its objections and answers to Mr. Wandke's First RFAs. (First Deeg Decl. at ¶¶ 5-6.) Amtrak served its objections and answers ("RFA Responses" (*id.*, Ex. C (dkt. # 31-1 at 17-25)) that day. (*Id.* at ¶ 7.) In its RFA Responses, Amtrak admitted twelve of the twenty-five RFAs and objected in whole or in part to the remaining thirteen. (*Id.*, Ex. C at 3-9.)

## II.      DISCUSSION

### A.      Deemed Admissions

First, Amtrak seeks to withdraw its deemed admissions and to substitute its RFA Responses. (Def.'s Mot. to Amend at 5.) A party may request that another party admit the truth of any relevant matter. Fed. R. Civ. P. 36(a)(1). "A matter is admitted unless, within 30 days after being served," the receiving party serves "a written answer or objection[.]" Fed. R. Civ. P. 36(a)(3). The receiving party may, however, move for a deemed admission to be withdrawn or amended. Fed. R. Civ. P. 36(b). "[T]he court may permit withdrawal or amendment [1] if it

would promote the presentation of the merits of the action and [2] if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits." *Id*. Whether to permit withdrawal or amendment is within a court's discretion. *See Conlon v. United States*, 474 F.3d 616, 621 (9th Cir. 2007) ("We review a district court's denial of a motion to withdraw or amend a Rule 36 admission for an abuse of discretion.").

Amtrak seeks amendment of deemed admissions, contending it: (1) would advance presentation of the merits of the action because there is evidence contradicting the deemed admissions; and (2) would not prejudice Mr. Wandke. (Def.'s Mot. to Amend; Def.'s Reply on Amend. at 1.) Mr. Wandke does not contest the issue of prejudice, but contends Amtrak has not provided admissible evidence contradicting the admissions. (Pl.'s Opp. to Amend. at 10.)

In its motion, Amtrak contests RFAs 8-14, 18-19, and 21-24, arguing that admission would "not conform to the evidence," but fails to explain how. (Def.'s Mot. to Amend at 5.) On reply, Amtrak addresses only RFAs 13-14, 19, and 21-22.[1] (Def.'s Reply on Amend. at 4-5.)

The Court will address each of the contested RFAs in turn:

**[RFA] No. 13:** Admit that Defendant has not identified or produced any documents showing that Defendant arranged for wheelchair accessible alternative transportation between Seattle and Tacoma for Plaintiff's trip.

**Answer:** Defendant objects to this request on the basis that it is misleading in that it implies the absence of non-documentary evidence. Subject to that objection and without waiving the same, Defendant admits that its process of arranging alternative transportation is verbal until said transportation is actually provided, and Defendant has no written documentation of its efforts to arrange wheelchair accessible transportation because Plaintiff departed King Street Station before said transportation arrived. Except as specifically admitted, Defendant denies [RFA] No. 13 in its entirety.

---

[1] With regard to RFAs 8-12, 18, and 23-24, Amtrak refers to Mr. Bannish's deposition and its motion for judgment on the pleadings (dkt. # 20), but makes no specific argument. (Def.'s Mot. to Amend at 5 n.2.) Because Amtrak has not shown that withdrawal of these deemed admissions would promote the presentation of the merits of the action, the Court denies its motion with regard to RFAs 8-12, 18, and 23-24.

1  (RFA Resp. at 6.)

2       Amtrak argues that an "unqualified" admission to RFA 13 "could be viewed –

3  incorrectly – as an admission that Amtrak did not arrange for accessible transportation." (Def.'s

4  Reply on Amend. at 5.) However, Amtrak's proffered response makes clear that there is no

5  dispute that Amtrak has no written documentation of its efforts to arrange wheelchair accessible

6  transportation for Mr. Wandke. Allowing Amtrak to substitute its RFA Responses would not

7  change the fact that it has admitted the truth of the matter in RFA 13. And deemed admission of

8  RFA 13 does not impair Amtrak's ability to introduce testimony and other non-documentary

9  evidence on the issue. Specifically, Mr. Bannish testified at his deposition, and provided a

10  declaration, regarding Amtrak's policies and procedures for arranging alternate wheelchair

11  accessible transportation. (*See* Second Deeg Decl., Ex. C (Bannish Dep.); Bannish Decl. (dkt.

12  # 43).) Mr. Bannish testified that no documentation would be created for wheelchair accessible

13  alternate transportation until "the service was actually used." (Second Deeg Decl., Ex. C

14  (Bannish Dep. at 89:14-22).) Mr. Bannish's testimony does not directly contradict RFA 13.

15       Amtrak also argues a deemed admission would "disregard the effect [Mr.] Wandke's

16  delay in filing suit had on Amtrak's ability to collect call records or other documentation of

17  actions taken[.]" (Def.'s Reply on Amend. at 5.) Amtrak argues the issue of laches in its

18  summary judgment motion, but makes no mention of call records or other documentation.

19  (Def.'s Mot. at 15-17.) Deemed admission of RFA 13 does not impair Amtrak's ability to make

20  its arguments regarding Mr. Wandke's timing in filing suit.

21       Replacing deemed admission of RFA 13 with Amtrak's response would not promote the

22  presentation of the merits of the action. Even with the deemed admission, Amtrak is able to

23

present arguments and defenses based on the clarification it offers in its response to RFA 13.

Accordingly, the Court denies Amtrak's motion with regard to RFA 13.

> **[RFA] No. 14:** Admit that Defendant [has] not identified or disclosed any witness who has or will testify that Defendant arranged for wheelchair accessible alternative transportation between Seattle and Tacoma for Plaintiff's trip.

> **Answer:** Defendant admits that, due to Plaintiff's undue delay in notifying Defendant of his claims, Defendant has been unable to identify any employee who recalls arranging Plaintiff's specific wheelchair accessible alternative transportation between Seattle and Tacoma. Defendant denies that it has not identified or disclosed any witnesses who will testify that Defendant arranges for wheelchair accessible alternative transportation for passengers affected by service disruptions, including those disruptions of service between Seattle and Tacoma. Except as specifically admitted, Defendant denies [RFA] No. 14 in its entirety.

(RFA Resp. at 6.) As with RFA 13, Amtrak argues that Mr. Bannish's testimony counters Mr. Wandke's "characterization of events" and that a deemed admission would disregard the effect of Mr. Wandke's delay in filing suit. (Def.'s Reply on Amend. at 4.)

In effect, Mr. Bannish's testimony provides evidence that Amtrak must have arranged for wheelchair accessible alternative transportation for Mr. Wandke because that is its policy and practice. While Amtrak's proffered answer admits that no witness recalls making the specific arrangements for Mr. Wandke, Mr. Bannish's testimony does contradict RFA 14.

Allowing Amtrak to amend its deemed admission of RFA 14 would thus promote the presentation of the merits of the action, satisfying the first prong of the test under Rule 36(b). Because Mr. Wandke makes no argument that he would be prejudiced, the second prong is satisfied as well. Accordingly, the Court grants Amtrak's motion with regard to RFA 14.

> **[RFA] No. 19:** Admit that Defendant treated Plaintiff disparately in not providing him with wheelchair accessible bus service between Seattle and Tacoma on December 21, 2019.

> **Answer:** Deny.

(RFA Resp. at 7-8.) Amtrak contends Mr. Bannish's deposition testimony "supports Amtrak's position that [Mr.] Wandke was not treated disparately[.]" (Def.'s Reply on Amend. at 4.)

"The first half of the test in Rule 36(b) is satisfied when upholding the admissions would practically eliminate any presentation of the merits of the case." *Conlon*, 474 F.3d at 622 (quoting *Hadley v. United States*, 45 F.3d 1345, 1348 (9th Cir. 1995)). Here, RFA 19 addresses a legal conclusion on one of the elements of Mr. Wandke's claims rather than a strictly factual matter. Upholding the deemed admission would practically eliminate any presentation of the merits of whether Amtrak discriminated against Mr. Wandke. Amtrak should be able to present its evidence on how it provides wheelchair accessible alternate transportation. With regard to the second prong of the test in Rule 36(b), Mr. Wandke does not contend he will be prejudiced by withdrawing the deemed admission of RFA 19. Accordingly, the Court grants Amtrak's motion with regard to RFA 19.

> **[RFA] No. 21:** Admit that Defendant did not provide wheelchair-accessible alternative transportation to Plaintiff [on] December 21, 2019.
>
> **Answer:** . . . Defendant admits that Plaintiff departed King Street Station before Defendant could provide him with wheelchair-accessible alternative transportation. Except as specifically admitted, Defendant denies [RFA] No. 21 in its entirety.

(RFA Resp. at 8.) Amtrak again relies on Mr. Bannish's testimony, arguing it "established that Amtrak provided alternative transportation." (Def.'s Reply on Amend. at 4-5.) There is no dispute that Amtrak did not, in fact, provide alternative transportation to Mr. Wandke. The reasons for that are disputed, and deemed admission to RFA 21 does not prevent Amtrak from presenting evidence regarding its reasons. Accordingly, the Court denies Amtrak's motion with regard to RFA 21.

> **[RFA] No. 22:** Admit that Defendant did not have a comprehensive list of accessible alternative transportation providers available at its Seattle station on December 21, 2019.

1

2       **Answer:** Defendant objects to this Request as vague and ambiguous as to the phrase "comprehensive list." Notwithstanding that objection, and subject to it, Defendant

3       responds as follows: Defendant lacks sufficient information to admit or deny this Request at this time, and therefore denies the same.

4 (RFA Resp. at 8.) Amtrak relies on Mr. Bannish's testimony that "he worked through a list of

5 regular vendors when sourcing alternative transportation[.]" (Def.'s Reply on Amend. at 5; *see*

6 Second Deeg Decl., Ex. C (Bannish Dep. at 32:4-20 ("We have a list that we go by, yes."),

7 40:18-25 ("all of the companies that we work with or that we had contracts with had the ability

8 to [accommodate] a power wheelchair")).)

9       Mr. Wandke argues that "Amtrak has never produced any such list, so it should have

10 admitted [RFA 22]." (Pl.'s Opp. to Amend. at 9.) Admitting it no longer has a list, however, is

11 not the same as admitting it never had a list. Amtrak should be permitted to present its evidence

12 on the matter. Amending the deemed admission of RFA 22 would promote the presentation of

13 the merits of the action, and Mr. Wandke does not contend it would prejudice him. Accordingly,

14 the Court grants Amtrak's motion with regard to RFA 22.

15       **B.**     **Summary Judgment Motions**

16       Mr. Wandke seeks summary judgment as to liability on his claims under the ADA and

17 the Rehabilitation Act. (Pl.'s Mot. at 3.) Mr. Wandke contends that, because Amtrak provided

18 safe, timely transportation to its ambulatory passengers but not to him, discrimination has been

19 established as a matter of law. (*Id*.) Amtrak seeks to dismiss Mr. Wandke's claims, arguing that

20 it had a reasonable emergency plan in place to obtain a taxi for him and that, because he left the

21 station before the taxi arrived, he has no evidence that Amtrak did not reasonably accommodate

22 him. (Def.'s Mot. at 2-3.) Amtrak also argues Mr. Wandke's claims should be dismissed under

23 the doctrine of laches, because witnesses' memories faded in the two years before he filed this

action, or based on spoliation of evidence because Mr. Wandke failed to preserve test messages and phone records. (*Id.* at 15-19.)

1. *Legal Standards*

Summary judgment is appropriate when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of showing the Court "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. The moving party can carry its initial burden by producing affirmative evidence that negates an essential element of the nonmovant's case or by establishing that the nonmovant lacks the quantum of evidence needed to satisfy its burden at trial. *Nissan Fire & Marine Ins. Co., Ltd. V. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The burden then shifts to the nonmoving party to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party. *Id*. at 585-87.

Genuine disputes are those for which the evidence is such that a "reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 257. The opposing party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient" to defeat summary judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). In addition,

1    it is the nonmoving party's responsibility to "identify with reasonable particularity the evidence

2    that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoted

3    source omitted). The Court need not "scour the record in search of a genuine issue of triable

4    fact." *Id.* (quoted source omitted); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider

5    only the cited materials, but it may consider other materials in the record.").

6        The court may only consider admissible evidence when ruling on a motion for summary

7    judgment. *Orr v. Bank of Am.*, *NT & SA*, 285 F.3d 764, 773-75 (9th Cir. 2002). "Conclusory

8    allegations unsupported by factual data cannot defeat summary judgment." *Rivera v. Nat'l R.R.*

9    *Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir. 2003).

10            *2.    ADA and Rehabilitation Act*

11        The ADA and the Rehabilitation Act prohibit Amtrak, as a federally funded public entity,

12    "from discriminating on the basis of disability." *Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th

13    729, 737 (9th Cir. 2021). "The two laws are interpreted coextensively[.]" *Id*. To establish a *prima*

14    *facie* case of discrimination under either law, Mr. Wandke "must show: (1) he is a qualified

15    individual with a disability; (2) he was either excluded from participation in or denied the

16    benefits of a public entity's services, programs, or activities, or was otherwise discriminated

17    against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by

18    reason of his disability." *Id.* at 737-38 (internal quotation marks and citation omitted). "A

19    disability discrimination claim may be based on . . . failure to make a reasonable

20    accommodation." *Id.* at 738 (internal quotation marks and citation omitted).

21        The parties do not dispute that Mr. Wandke has satisfied the first and third elements.

22    Their disagreement is limited to whether he was denied the benefits of Amtrak's services or

23    otherwise discriminated against. (*See* Def.'s Mot. at 9.)

1        Mr. Wandke contends discrimination is established because Amtrak's prearranged

2    transportation for ambulatory passengers departed timely, but wheelchair accessible

3    transportation was not sought until after he arrived at the Seattle station and would not have

4    timely and safely brought him to his destination. (Pl.'s Reply at 5-6.) Amtrak contends that its

5    plan to transport Mr. Wandke was a reasonable emergency accommodation and that, because Mr.

6    Wandke left the Seattle station before wheelchair accessible transportation arrived, he has no

7    evidence that he was denied Amtrak's services. (Def.'s Mot. at 9.)

8                 i.      Safe Transportation

9        Mr. Wandke contends the only transportation offered to him was unsafe because it would

10   have required two wheelchair users to share a taxi that could safely accommodate only one of

11   them. (Pl.'s Mot. at 13.) Amtrak counters that Mr. Wandke's "self-serving testimony is

12   uncorroborated and is contradicted by" Mr. Bannish's testimony that he has never required two

13   wheelchair users to share one van. (Def.'s Mot. at 12 (citing Second Deeg Decl., Ex. C (Bannish

14   Dep. at 30:25-31:5)).) In addition, Amtrak contends the passenger manifest shows "only one

15   wheelchair user riding on the train in question." (*Id.* (citing Second Deeg Decl., Ex. D).)

16   However, as Mr. Wandke notes, Mr. Bannish's testimony shows that wheelchair users are not

17   always identified before arriving at the station. (*See* Second Reynoldson Decl. (dkt. # 41), Ex. 1

18   (Bannish Dep. at 46:15-22 ("Q. [H]ow do you know if there's a passenger who needs accessible

19   alternative transportation? A. I don't always know.")).)

20        Mr. Wandke argues that "Mr. Bannish's testimony as to his own practice . . . cannot

21   contradict Mr. Wandke's testimony as to what actually occurred" on December 21, 2019. (Pl.'s

22   Reply at 7.) However, Mr. Wandke cites no authority supporting this statement, and the Federal

23   Rules of Evidence indicate otherwise. "Evidence of a person's habit or an organization's routine

1  practice may be admitted to prove that on a particular occasion the person or organization acted

2  in accordance with the habit or routine practice." Fed. R. Evid. 406.

3       Mr. Wandke next argues that it "does not matter" if Amtrak actually ordered two

4  wheelchair accessible taxis, because its representative "told Mr. Wandke that he would have to

5  share a single accessible taxi with another wheelchair user," and thus, his decision to leave was

6  reasonable.[2] (Pl.'s Reply at 7 (emphasis omitted).) Liability under the ADA and Rehabilitation

7  Act, however, is based not on Mr. Wandke's actions but on Amtrak's.

8       Factual disputes remain on the issue of whether Amtrak offered safe alternative

9  transportation to Mr. Wandke, whether Amtrak would have required two wheelchair users to ride

10  in one taxi, and whether that would have been safe. The Court cannot resolve factual disputes on

11  summary judgment, and thus denies both parties' motions for summary judgment on this issue.

12             ii.     <u>Timely Transportation</u>

13       Mr. Wandke contends Amtrak discriminated against him because the bus with

14  ambulatory passengers left within forty minutes of the train's arrival in Seattle, while an Amtrak

15  representative told him the wheelchair accessible taxi would be at least forty minutes later than

16  that. (Pl.'s Mot. at 14.) Amtrak contends Mr. Wandke cannot show discrimination because he

17  has no evidence regarding when the taxi arrived, whether he would have been given that taxi,

18  and how long it took the bus with ambulatory passengers to get to Tacoma. (Def.'s Mot. at 14.)

19       The Court cannot conclude, as a matter of law, that Amtrak's accommodation was

20  unreasonable because the bus with ambulatory passengers left the Seattle station earlier than Mr.

21  Wandke would have left. However, Mr. Wandke has presented evidence from which a jury could

22

23  _____

[2] Mr. Wandke does not appear to offer his testimony of what an Amtrak representative told him for the truth of the matter asserted, *i.e.*, that Amtrak would require the two wheelchair users to share one taxi, presumably because it would be inadmissible hearsay. *See* Fed. R. Evid. 801(c).

1    conclude that the transportation offered to him was substantially delayed relative to that offered

2    ambulatory passengers. By the time he left the Seattle station, approximately twenty minutes

3    after the bus with ambulatory passengers left, no taxi had arrived yet. (First Wandke Decl. at

4    ¶ 33.) Moreover, even if a taxi had arrived a minute later, Mr. Wandke's testimony that he had

5    resolved to let the other wheelchair user, who had no other option, take the taxi is evidence that

6    he would have been further delayed if he had remained at the station. (*Id*.)

7           Amtrak suggests that, despite any delay in leaving the Seattle station, a taxi with Mr.

8    Wandke might have arrived as soon as or sooner than the bus with ambulatory passengers

9    because the bus likely would have had to make a stop in Tukwila. (Def.'s Mot. at 14 n.8.) There

10   is no evidence before the Court regarding how long making an extra stop would have taken or

11   any other reason why a bus or taxi would have traveled faster or slower.

12          Given the factual disputes over when transportation offered to Mr. Wandke would have

13   left Seattle and arrived in Tacoma compared to the bus for ambulatory passengers, the Court

14   denies both parties' summary judgment motions on this issue.

15                          iii.    Reasonable Accommodation

16          Amtrak contends Mr. Wandke's claims must be dismissed because he fails to identify a

17   specific reasonable accommodation. (Def.'s Mot. at 12.) Mr. Wandke contends Amtrak should

18   order wheelchair accessible vans or taxis in advance when wheelchair accessible buses are

19   unavailable, and should not require two wheelchair users to ride in one taxi. (Pl.'s Mot. at 12;

20   Pl.'s Resp. at 5; Pl.'s Reply at 5-6.)

21          "[A] plaintiff is required to identify specific, reasonable accommodations that a defendant

22   failed to provide." *Green v. Tri-County Metro. Transp. Dist. of Oregon*, 909 F. Supp. 2d 1211,

23   1219 (D. Or. 2012) (citing *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002)).

In *Green*, the court granted summary judgment dismissing a claim under the ADA for failure to reasonably accommodate the plaintiff's disability because the plaintiff had presented insufficient evidence of any effective alternative. *Id.* Here, Mr. Wandke has identified specific accommodations. (*See* Pl.'s Mot. at 12.) Factual disputes exist, however, as to whether the proffered accommodation is feasible.

Mr. Wandke argues "Amtrak is undeniably able to arrange for accessible transportation to be waiting for ambulatory passengers when the train arrives at the station" but "chooses to treat its wheelchair-using passengers" differently. (Pl.'s Reply at 6.) That factual assertion, however, is disputed. Mr. Bannish's testimony provides evidence that Amtrak is not always able to arrange wheelchair accessible transportation to be waiting at the station, because accessible buses—which can be ordered in advance and which he preferentially seeks—are not always available and accessible taxis cannot be ordered in advance. (Second Deeg Decl., Ex. C (Bannish Dep. at 26:16-28:4).)

Accommodations that would "fundamentally alter the nature of the service, program, or activity" are not considered reasonable. *Green*, 909 F.Supp.2d at 1216 (quoting 28 C.F.R. § 35.130(b)(7)). Amtrak argues it could not provide prearranged transportation for wheelchair users unless it operated its own fleet of vehicles, which would fundamentally alter the nature of its services as a rail service. (Def.'s Mot. at 10.) Mr. Wandke provided conflicting evidence, stating in a declaration that, in his experience, "it is possible to order wheelchair-accessible taxis from Yellow Cab Seattle in advance or make wheelchair-accessible taxi reservations to pick up a passenger at a certain time and location." (Second Wandke Decl. (dkt. # 38) at ¶ 7.) Amtrak argues it is "not requesting individual taxi services for its own use," but fails to explain why that difference is dispositive. (Def.'s Reply at 2-3.)

1      Amtrak further argues that it cannot prearrange taxis because, "even in route, Amtrak

2   employees cannot reliably predict when a train will arrive at a particular station." (Def.'s Reply

3   at 3 (citing Bannish Decl. at ¶ 3).) Mr. Wandke's evidence that accessible taxis can be ordered in

4   advance does not expressly address how far ahead taxis can or must be ordered, and whether

5   adjustments can be made to the time of arrival. Given these uncertainties, summary judgment is

6   inappropriate. Moreover, even if a taxi could not be ordered ahead of time, factual disputes

7   remain over whether the transportation Amtrak offered would have required two wheelchair

8   users to ride in a taxi that was safe for only one.

9      Finally, Amtrak argues that the ADA and Rehabilitation Act do not require "perfect"

10   accommodation and that a reasonable accommodation may include one that is delayed. (Def.'s

11   Reply at 2.) "[T]he law does not require a perfect accommodation, only a reasonable one." *Marie*

12   *v. Arizona Dep't of Econ. Serv.*, 2020 WL 977932, at *9 (D. Ariz. Feb. 28, 2020).

13      Nevertheless, as detailed above, unresolved factual issues preclude the Court from

14   determining whether the accommodation Amtrak offered was reasonable. There remain genuine

15   issues of material fact such as: whether Amtrak could have ordered a wheelchair accessible taxi

16   ahead of time; whether when Amtrak ordered a taxi, it should have ordered two taxis at the same

17   time; and whether there were two wheelchair users awaiting alternative transportation. The Court

18   cannot conclude, as a matter of law, that Amtrak's accommodation was reasonable.

19      Accordingly, the Court denies both parties' summary judgment motions.

20         *3.     Laches*

21      Amtrak acknowledges that Mr. Wandke filed his action within the statute of limitations,

22   but argues it should be granted summary judgment on its defense of laches because Mr. Wandke

23   waited over two years to file suit. (Def.'s Reply at 5.) Mr. Wandke contends laches is

1    inapplicable to his claims at law, there is a strong presumption against laches even for equitable

2    claims, laches is inappropriate to bar prospective relief, and the public interest weighs against

3    laches here. (Pl.'s Resp. at 7-14.)

4          If a plaintiff files suit within the "statute of limitation . . . for the analogous action at law,

5    . . . there is a strong presumption against laches." *Eat Right Foods Ltd. v. Whole Foods Mkt.,*

6    *Inc.*, 880 F.3d 1109, 1115 (9th Cir. 2018) (citations omitted). "Applying laches within the

7    limitations period would . . . clash with the purpose for which the defense developed in the

8    equity courts." *SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 580 U.S. 328,

9    335 (2017) ("Laches is a gap-filling doctrine, and where there is a statute of limitations, there is

10   no gap to fill.").

11         Amtrak fails to overcome the strong presumption against laches. "To establish that laches

12   bars a claim, a defendant must 'prove both an unreasonable delay by the plaintiff and prejudice

13   to itself.'" *Eat Right Foods Ltd.*, 880 F.3d at 1115 (quoting *Evergreen Safety Council v. RSA*

14   *Network Inc.*, 697 F.3d 1221, 1226 (9th Cir. 2012)). Amtrak argues that it has been prejudiced

15   because its potential witnesses "are either unidentifiable, have left Amtrak's employment, or

16   have no memory of the events." (Def.'s Mot. at 17.) Mr. Bannish stated in a declaration that,

17   "[h]ad [Mr.] Wandke's concerns been brought to my attention within days, weeks, or months of

18   his trip, I believe I would recall details of that day." (Bannish Decl. at ¶ 9.) Amtrak provides no

19   other evidence of employees whose memories have faded and no evidence concerning

20   employees who are unidentifiable or have left its employment. Amtrak does not explain how it

21   identified Mr. Bannish as a potential witness or why it could not identify other witnesses. Nor

22   does it mention any efforts it made to locate potential witnesses who have left its employment.

23

Amtrak cites *Evergreen Safety Council*, but in that case, the plaintiff's "ten-year delay . . . caused evidentiary prejudice because [a primary witness] had died, . . . other involved employees had relocated or forgotten about components of the case[,]" and plaintiff's own records had been destroyed. 697 F.3d at 1227. Nothing so extreme has occurred here.

Amtrak also cites *In re Dalziell*, holding Washington courts may apply laches despite an applicable statute of limitations "when a special reason is shown why a shorter period should be enforced, or some controlling equity applies, or the facts present highly unusual circumstances." 608 B.R. 245, 251 (Bankr. E.D. Wash. 2019) (quotation marks and citations omitted). In that bankruptcy action, the court found highly unusual circumstances and the controlling equities compelled the application of laches because debtors had relocated and incurred new debts, which they may not have done if not for the creditors waiting over a decade to file suit. *Id.* at 252. Here, Amtrak has not taken actions based on Mr. Wandke's delay in filing suit.

Finally, Amtrak cites *Romans v. Incline Vill. Gen. Improvement Dist.*, an unpublished Ninth Circuit decision that held the district court had not abused its discretion in applying laches although the action was filed within the statute of limitations. 658 F. App'x 304, 306 (9th Cir. 2016). There, because state agency records showing failure to exhaust administrative remedies— records "critical to [defendant's] defense on a dispositive issue"—had been destroyed, the Ninth Circuit found that prejudice was established. *Id.* at 307. Here, however, Amtrak has not shown destruction of critical records conclusively deciding a dispositive issue.

Amtrak's evidence is insufficient to overcome the strong presumption against laches. Accordingly, the Court denies Amtrak's Summary Judgment Motion on this issue.

         4.    *Spoliation*

Amtrak contends Mr. Wandke's failure to preserve contemporaneous text messages and

1   phone call information, "in concert with his conscious and inexplicable delay in filing suit," has

2   prejudiced Amtrak by preventing it from documenting "any misrepresentation" by Mr. Wandke.

3   (Def.'s Mot. at 18.) As a sanction, Amtrak seeks dismissal of this action. (*Id.* at 19.) Mr. Wandke

4   contends the unintentional loss of his phone records does not warrant sanctions. (Pl.'s Reply at

5   12.)

6        Mr. Wandke stated in a declaration that, shortly after December 21, 2019, he received a

7   new cell phone and returned his old one to the store, believing his text messages and phone

8   records would be available on the new phone. (Second Wandke Decl. at ¶¶ 15-18.) When he

9   realized they were not, he sought help from the store but was "unsuccessful in recovering either

10  [his] text messages or the records of [his] phone calls from the old phone." (*Id.* at ¶ 19.)

11       Spoliation occurs when a party "destroys or alters material evidence or fails to preserve"

12  evidence when the party is under a duty to preserve it. *See Kische USA LLC v. Simsek*, 2018 WL

13  620493, at *4 (W.D. Wash. Jan. 29, 2018) (citing *Apple Inc. v. Samsung Elec. Co., Ltd.*, 888

14  F.Supp.2d 976, 989 (N.D. Cal. 2012)). The party alleging spoliation must prove:

15       (1) that the party having control over the evidence had an obligation to preserve it
         at the time it was destroyed; (2) that the records were destroyed with a 'culpable
16       state of mind;' and (3) that the evidence was 'relevant' to the party's claim or
         defense such that a reasonable trier of fact could find that it would support that
17       claim or defense.

18  *Apple Inc.*, 888 F.Supp.2d at 989.

19       Mr. Wandke does not dispute his obligation to preserve his phone records, but disputes

20  that he had a culpable state of mind or that any evidence lost would support Amtrak's defense.

21  (Pl.'s Resp. at 15-16.) Because the first element is satisfied, "the court considers the prejudice

22  suffered by the non-spoliator and the level of culpability of the spoliator, including the

23  spoliator's motive or degree of fault." *Simsek*, 2018 WL 620493, at *4 (citing *Moore v. Lowe's*

1    *Home Ctrs., LLC*, 2016 WL 3458353, at *3 (W.D. Wash. June 24, 2016)). Here, Amtrak does

2    not argue that Mr. Wandke had any improper motive. The degree of fault is minimal because the

3    destruction was unintentional.

4           Moreover, Amtrak fails to show prejudice. Failure to preserve evidence "does not

5    necessarily warrant default or dismissal if these actions 'do not eclipse entirely the possibility of

6    a just result.'" *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1071 (N.D. Cal. 2006)

7    (quoting *Advantacare Health Partners, LP v. Access IV*, 2004 WL 1837997, at *5 (N.D. Cal.

8    Aug. 17, 2004)). Here, Amtrak fails to establish that Mr. Wandke's failure to preserve phone

9    records interferes with a just result. Amtrak has made no showing that the lost records would

10   likely contradict Mr. Wandke's testimony. Amtrak does not disclose any effort to seek text

11   messages or call records from the people Mr. Wandke identified that he was in contact with

12   around December 21, 2019, or to depose them, which suggests that such discovery would not

13   assist Amtrak's case. In fact, Amtrak describes such discovery as "of dubious value." (Def.'s

14   Reply at 10.)

15          The Court has no basis to conclude that Amtrak has been so severely prejudiced that

16   dismissal of Mr. Wandke's claims is warranted. Accordingly, the Court denies Amtrak's motion

17   in this regard.

### III.   CONCLUSION

19          For the foregoing reasons, the Court: (1) GRANTS in part and DENIES in part Amtrak's

20   Motion to Amend (dkt. # 30); (2) DENIES Mr. Wandke's Partial Summary Judgment Motion

21   (dkt. # 27); and (3) DENIES Amtrak's Summary Judgment Motion (dkt. # 33).

22          Dated this 13th day of January, 2023.

23

1

MICHELLE L. PETERSON
United States Magistrate Judge

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23